as I was preparing for this argument, I was rereading Apelli's brief, and I was struck by the one point that is clear from their brief, and that is, they do not agree with the opinion in the first case. That's perfectly clear. We got that. That opinion, though, is, however, the law of the case and the law of the circuit. That panel held that Mr. Cornejo-Barreto has a right to review the agency's decision of the Administrative Procedures Act once the secretary decided whether to exercise his discretion and order extradition. That's exactly what happened here. The secretary ordered Mr. Cornejo's extradition, and we sought administrative review under the Administrative Procedures Act back in the district court as the first panel. Of course, that assumes that that decision doesn't fall into one of the two exceptions that the APA recognizes for our jurisdiction. Well, except that the first panel already addressed those exceptions under the APA. Well, did it since the secretary had not yet acted? How could our first panel have predicted on what basis the secretary might act when it declared that there was, in fact, some form of review that might be available? I guess the question I'm really asking you is, why shouldn't we treat that all as dictum from a panel that clearly could not reach that question since the secretary had not then acted? Well, the panel never, in fact, reached the question as to whether there was a future decision by the secretary which somehow be in violation. That was never before the panel. All the panel decided was that the issue was not at that time right, but that if, in fact, the secretary did order it, given the statutory scheme and such, that Mr. Korniakou could then seek review under the Administrative Procedures Act. Okay, but then maybe we're sort of arguing round and round here. Then my question still becomes, can't we still look at the APA exceptions under either, you know, Well, conceivably it could if, in fact, we knew how the secretary exercised his discretion. The problem in this case is there's no record. Well, we've got a declaration from the fellow who heads the office that conducts the review and processing of these extradition claims. A declaration not specific to this case. A declaration as to the general procedures that may be applied in these types of cases, but with no specific reference to what, in fact, happened in this case. Nor is there anything from you indicating what may have happened. Well, I don't know. But, in fact, there is some information that I did provide. Whether the secretary considered it or not, we don't know because, again, we were not afforded access. Well, there's nothing to show that the secretary or to suggest that the secretary didn't consider or treated this case differently from the way his regulation says that he will treat every case. Well, there's nothing to indicate that because nobody's ever looked at the agency record. Well, I understand, but that's the conundrum. It's very similar to selective prosecution cases. I mean, it puts people in a big bind who want to try to say that there is selective prosecution. But that's what happens when you've got a situation with extraordinary agency discretion. I understand that. But what I would my response to that would be it's different than selective prosecution because under the Administrative Procedures Act and specifically Section 706, the court is required to review the entire record or those parts of it cited by the parties. So we should boldly go into the field of foreign relations and opine on whether or not the secretary properly engaged in diplomatic exchanges with the Mexican government to assure the safety and security of your client upon return once we execute? With all due respect, I think that's a bold oversimplification of the issue, an overstatement of this kind of parade of horribles that it's been presented by. Well, you're asking us to review the record, which we don't have. And I'm taking you at your word and suggesting that if we do, it is like assuming that the secretary will let us look at it, which is a different question. I'm assuming there are going to be communications in there between the Mexican and United States governments as to promises that may or may not have been made with regard to how your client's going to be treated if he's extradited. And my question for you is really based in the Constitution. Do we really have the authority under Article III to tell the secretary of state whether or not we think he's adequately carried out his job in the field of foreign affairs? Courts run into a similar situation all the time in reviewing cases under the Administrative Procedures Act. But this is far different from whether or not, you know, the EPA has conducted an adequate review for purposes of an environmental impact statement. This gets into some very sensitive relations between countries. Well, what I would submit is that the APA standard of review is sufficiently deferential to the agency action to account for that. This is not a situation, as Respondent suggests, where courts are going to be second-guessing the decision of the secretary of state. This is a situation where if the secretary can point to evidence in the record, in the administrative record that supports his exercise of discretion, then that's as far as the court can go. All right. Then in that case, Mr. Wilk, why isn't it open to us to say we know what the secretary had before him. We don't know what else he may have considered. But we do know that he had the record of the extradition proceedings. We know he had declarations which your client presented. We do know that he had the State Department human rights report. And based on that record, is it available to us to say, well, he couldn't have abused his discretion, he couldn't have been arbitrary and capricious because there is evidence from which anybody could disbelieve that there was a threat, a serious threat of future torture. All of that evidence to which the court cites to was all evidence that I put before the secretary either at, or Mr. Cornejo, in the extradition hearing, put into the record at the extradition hearing, or it was subsequently submitted by Mr. Cornejo to the secretary prior to the exercise of his discretion. All of that evidence, in fact, supports Mr. Cornejo's position that, in fact, there is a substance. But it also supports a contrary position, which is all we have to say. Was it arbitrary and capricious? And I'm putting the proposition to you that if you look at that record based, if nothing else, on the fact that he went back to Mexico several times without any incident, that anybody looking at that record could rationally conclude that there was no serious threat of future prosecution, of future torture. But the only judicial review of that record on an evidentiary level was that before the magistrate judge in the original extradition hearing. And when he heard that evidence, when he looked at that record, he, in fact, stated that he was not looking at that record. Maybe you're not answering my question because you don't want to. And I understand that fully. But we know that that record was before the secretary by statute. But we don't know whether he looked at it. Of course not. Nor do we know, nor do you know whether I'm going to look at anything that I do either. But when you get a decision from me, the issue is, is it reasonably supported, whether or not I looked at anything. All right? So we've got the secretary's decision. Execute the extradition warrant. The question is, was that decision arbitrary and capricious? And what I am suggesting is it can't be, because on the record we know that the secretary considered there is support for executing the warrant. First off, I would disagree that whether we know that or not. We don't know whether the secretary looked at it. Second, I would submit that this is on a horse with the Citizens of Overton Park case, Overton Park case versus Volpe, where there what they attempted to rely on was post after the fact affidavits submitted by the agency to say this was our reasoning. And the Supreme Court in that case said that's not good enough. We don't, that's not happened here. We have no post decision explanation of reasoning. We have less than that. We have nothing. There's nothing that says the secretary has to issue a reasoned decision. But then what we have is we have no administrative review. I mean, where that line of argument leads is we effectively, administrative review is meaningless. And so we have to look at the entire record and not simply rubber snap the agency's decision. In this situation, if we do not look at the record and we simply presume that the agency did it the right way, what we're doing is we're saying there is no APA review. There is no APA review. At a minimum, at a minimum, a judicial official now has to look at the agency record. There may be another question. We have to look at those communiques between the embassies of Mexico and the United States to see what assurances. If any such exist. We don't know that any such exist in this case. We know that they may exist. But there is no evidence in this case that there were actually any such communiques. All Mr. Witten's declaration says is that we may do this, we may do that. So is it your position that if such communiques exist, and we don't think that the language in the communiques is clear enough to promise that your client won't be tortured again, then we can tell the secretary your decision is wrong and we are not going to permit you to extradite? I think that once the court looks at the record, the court will then evaluate, should then evaluate the agency's decision under the highly deferential arbitrary and capricious standard. And I am the first to admit that once we get to that stage, the secretary has significant discretion. And at this court's review... Once we get to that stage, you've just postulated a train wreck between two branches of government. I... You are now dictating to the secretary of state what the policy of the United States should be as to whether or not we will honor a treaty obligation with Mexico to extradite a wanted felon. The train wreck that the court suggests, I would submit, is vastly overstated. What we have here is we have not just one treaty, the extradition treaty, but we have a second treaty, the U.N. Convention Against Torture. Not self-executed. Which, however, though, has been executed, has been implemented through the Foreign Affairs Reform and Restructuring Act as held by the first panel. So what we have here is just the balance of the competing treaties. And what the first panel decided was that the first cut should be given to the secretary. This is a situation that the agency, it's more apropos to allow them to make the initial decision. However, it's not going to be entirely within their discretion, not subject to judicial review. Once he makes that decision, once the secretary makes that decision, we will, a court can then look at it under this highly deferential standard of reviewing agency actions under the Administrative Procedures Act. That does not, with all due respect, it does not suggest there's going to be a train wreck. It suggests that we're simply doing here what courts do all the time. The courts never review foreign policy decisions. But this is not choose, Mr. Wilkie, between which treaty obligation the United States will abide by under this treaty and whether we'll ignore an obligation under another treaty. But courts routinely balance interests of both, of both the individual against you. But we're not asking the court to choose. We're simply asking the court to balance the competing interests. But the competing interests are very clear. One treaty says we've got to send him back. Another treaty suggests that if we find that there is a high risk that he's going to be tortured if he's returned, that we don't return him. And that's where I say a train wreck is. The extradition treaty does not say we have to send him back. The extradition treaty says we have extradition procedures by which we may send him back. That's true. But in the normal case, without the torture aspect, you would concede, would you not, that once the magistrate judge determines identity and probable cause, the Secretary's decision to actually extradite is pretty much a ministerial act. Well, it is a discretionary act. It's not a ministerial act. The Secretary at that point has discretion to order extradition or not order extradition. It is not mandatory that the Secretary order extradition at that point. That was, in fact, a position taken all along in the earlier litigation by the government in this case, is that we, whether we extradite him or not, is within our discretion after the judicial proceedings regarding certifiability of extradition. So I would not agree that it's a ministerial act. It heretofore has been a discretionary act by the Secretary. But what I would submit is that in light of the Foreign Affairs Reform and Restructuring Act, in light of the first opinion in this case, recognizing the right to judicial review under the APA, the balance, there now is a required balance that a court is to conduct, a required balance under the Administrative Procedures Act. Ms. Wilk, would you like to argue why we should not, A, say that it's dicta, everything after the first part of the opinion is dicta, or, B, make a corresponding in-bank call with respect to that case? First the dicta question. This was a situation where, one, the court characterized it as the holding of the case. Two, the court, the first panel, avoided the issue that was briefed and presented, and that is whether the treaty was self-executing or not self-executing. I know, Judge Common, you raised that issue earlier, but that issue has yet to be decided. If, in fact, this court were to rule with respondent in this particular appeal, what we would be doing is setting this litigation back three years. We would go back to the position we were in in 2000. But that's not the question I think that we're concerned about. The question is, if we are bound by the decision and we think that that decision conflicts with our powers of review with regard to the treaty issue, isn't the answer to that question in this case to simply call for an in-bank review? Well, I think that the ball would be in Respondent's court there. I think that this Court is – We can do it on our own, can't we? Make a corresponding in-bank call. At this point, I do not think there's any conflict in the circuit or any conflict with any other law. To the extent that this panel doesn't agree with the first panel decision, I think this panel is still bound by the decision of the first panel. If the case is going to go in-bank, it should come from Respondent, and I do not believe in this Court. It doesn't have to. So what I was giving you is a chance to argue why the case is not so flatly wrong that it merits in-bank reconsideration. Well, the – I think the case was in fact a – represented a compromise of the competing treaties here, a compromise that says to the Secretary of State, look, we are going to defer to you on this, but given the enormous interest at stake, given the recognition that protecting individuals against torture is a paramount concern of this government recognized by both treaties and statutes and is now implemented in a statutory scheme, in a regulatory scheme, we are going to oversee this and we have the authority to oversee this under the Administrative Procedures Act. I think that that decision recognizes a policy balance and a – it provides a legal basis for balancing these competing rights. And the paramount right recognized by both the U.N. Convention Against Torture and also by the Foreign Affairs Reform and Restructuring Act is that this country and this government will not participate in any way as an aider and a better in any way tangentially in the torture of individuals. That right becomes paramount as recognized in the statute and the treaties. Competing against that right is, of course, the foreign policy concerns, the foreign policy interests. But I would submit that this case of Mr. Cornejo Barretta or any one individual and whether he is going to be extradited to a foreign country does not create this foreign policy crisis as is suggested by the Secretary of State. It is one individual, one extradition case of which thousands are processed every year. The fate of our foreign policy interests in this country do not rise and fall on whether Mr. Cornejo Barretta gets extradited to Mexico. But it might rise or fall on whether or not Article III judges are seen as taking over the direction of foreign policy. And that's why I'm wondering whether this case isn't worthy of in-bank review. That if that is the way we are going to go, there ought to be at least 11 judges on this court who make that decision rather than two. I would submit that there is no risk of judges taking over foreign policy here. Well, you're asking us to choose between treaty obligations. And that causes me pause as an Article III judge. But with very limited discretion, the discretion as limited by the Administrative Procedures Act, all the court can do is reverse the agency decision if it is arbitrary, capricious, or an abuse of discretion. As this court knows, that is a highly, highly deferential standard of review. Perhaps the most deferential standard of review that the court applies. And so the risk of creating some foreign policy crisis, I would submit, is minimal. What the court can't do, however, is simply rubber stamp the agency decision. And that's what happened here. We can't say there's an APA review and then not look at the administrative record. I would like to save a little bit of your time. I would. Thank you. May it please the Court. I'm Douglas Letter from the United States Department of Justice and urging affirmance here. I'd like to start right out, if I may, by addressing the question, Judge Reimer, that you asked. The government here does urge affirmance, but this is an extremely unusual situation. The Solicitor General has taken a step of authorizing, as we stated in our brief in advance, that we do believe that this matter is so important that if this court, this panel, decides that the prior panel's statements about judicial review under the Administrative Procedure Act are the holding and the law of this circuit, we will seek in bank and, indeed, we urge this court sua sponte to call for in bank if that is its conclusion. And as I say, the Solicitor General has already looked at that and made that determination. Would you do that? Would you seek in bank of a decision that affirmed on the basis that, given the record that we know was in front of the Secretary, the Secretary could not possibly have made an arbitrary or capricious decision? Your Honor, if the Court affirmed on that basis, I may be wrong. I think we actually cannot seek in bank because we would have won. I can say to you very clearly the government, although the district court ruled on that ground, we are not urging this court to affirm on that ground. I realize that you're not. Right. So put it this way, again, we urge this court to sua sponte, seek in bank if it holds the prior panel ruling. Because the sort of mere existence of that precedent is so horrifying that it should go? Yes, Your Honor. And if limited and constrained as my proposition that I spent some time talking with Mr. Wilkie about, were the law out of this case? Yes, Your Honor. And the reason that's a very good question. The reason for that is, remember that extradition has a couple of different parts to it. And one is, and this is very particularly an issue with Mexico, we have a lot of matters where they're seeking extradition, and we have matters where we're seeking extradition. Both countries have been annoyed with each other because things take too long. If Your Honor affirmed on the district court's ground, that would mean each extradition would take a couple of years longer. Because in each instance, the Secretary of State would make the determination to extradite. There would then be an Administrative Procedure Act case that would have to go through district court and then appeal and then assert denial. And so we would be talking at least probably a couple of years that every extradition would be delayed. And so from our perspective, that's a major problem. And in addition, I'd like to address specifically what my friend, Mr. Wilkie, was saying. I direct you to page 185 of the record excerpts, and that's where Mr. Witten from the State Department has explained one of the main problems with the APA review that Mr. Wilkie is suggesting, and why simply asking this Court to give deference is not good enough. As Mr. Witten explains there, when we do ask for assurances from foreign countries, Your Honors can imagine that this is an extremely serious thing. We are saying to another country, in essence, we don't know that we trust your judicial system, and so we want assurances from you. Sometimes it's fine for us to do that publicly. It may be a country whose we have the State Department has already criticized publicly, but it might be a country that we have not criticized publicly. And so even to put on the public record sometimes that we have asked a foreign country for special assurances, and at what level, for example, if here we decided that asking for assurances from local officials wasn't enough, and so we actually went very high up in the Mexican federal government. Again, under some circumstances you might say, well, that's no big deal, but I'm sure you can imagine in many circumstances that were publicly announced that would be major. And so what our big concern here is that if there is any Administrative Procedure Act review, that in itself causes a major foreign policy concern. And as I wanted to pick up also on the question that Judge Tallman asked, even with significant deference from this Court, what my friend Mr. Wilkie is asking for is that nevertheless this Court does get into weighing, okay, did the Secretary of State properly ask for assurances? Were the assurances that he got from the foreign minister of Mexico or France or whatever country we pick, were they sufficient? And these kinds of questions we believe are not appropriate for the Article III courts. Indeed, this Court and the Supreme Court have recognized this for many, many years, the rule of non-inquiry. This Court, most recently in 1997 in the Lopez case, building on a large quantity of Supreme Court precedent, has recognized that this is an area that is not appropriate for the courts. If I could just go for a moment to why we think this Court can find that the prior determination by the panel, the other panel about Administrative Procedure Act review is dictum. And I am fully aware that I'm getting into a thicket in this Court that's been addressed in a batch of opinions recently. As we understand the classic definition of dictum, and this is I think expounded recently by Judge Tashima in several cases, is that was the later panel looks to see whether the determination was necessary for the prior panel's ruling. The prior panel held that the matter was not right because the Secretary of State had not yet made an extradition decision. That then should be the end of it. That's the holding. If what Mr. Wilkie was looking for was review of the Secretary of State's decision, there had been no decision, and therefore, clearly, it could not be right. So as Judge Kaczynski made clear in his concurring opinion, that should have been the end of it. So that anything that came after that, we believe this Court, under the classic definition of dictum, can hold that indeed it was dictum. Even under Judge Kaczynski's alternative view that he's expressed in several opinions about what is dictum. We can just bind him to what he said in that opinion. Okay. I'll stop there. If then it is open to this Court, to this panel, as we believe it can, to look at the merits of the APA jurisdictional determination, note that Congress itself passed the FAR Act, the Foreign Relations Act that's key here. In 1998, to implement this Convention Against Torture, it did so against a backdrop of not just this Court, but as I said, the Supreme Court and many other courts, saying we have a rule of non-inquiry. And by the way, that rule of non-inquiry is very, was applied very broadly by this Court and others. For example, in the Lopez case, this Court said it would not inquire into the Secretary of State's decision to examine a claim where there the habeas petitioner said the Mexican court is corrupt. When I think it was my sister went down to try to defend me, she was told if she paid $20,000, I would be let off. So an allegation going to the very heart of the foreign judicial system. This Court said, nevertheless, that's for the Secretary of State. The Ahmad decision from the Second Circuit, there the fugitive claimed that if he were sent back to Israel, he would be tortured. The Second Circuit said, nevertheless, that is for the Secretary of State to work out with the Israeli government, not for the courts. So Congress legislates against that backdrop. And when it passes the FAR Act, it says that the statute provides, notwithstanding any other provision of law, no court shall have jurisdiction to review the regulations adopted to implement the section, and this is the key part, and nothing in this section shall be construed as providing any court jurisdiction to consider or review claims raised under the convention or this section or any other determination made with respect to the application of the policy set forth, et cetera, except as part of a deportation determination. So Congress itself specifically says deportation is different, but Congress says, understanding there is a rule of non-inquiry, says nothing in this new statute is meant to provide jurisdiction. We think that is very strong evidence that Congress did not mean to change the system that it existed for well over 100 years of non-inquiry, and by passing, by ratifying the Convention Against Torture by the Senate, and then passing the FAR Act to implement it, meant to make this radical revolution in the way the judicial branch and the executive branch would act under, in this very delicate realm. There's absolutely no evidence of any kind in either the statute or the legislative history that Congress meant to do something that truly would have been revolutionary. The problem, of course, is that there's a great deal of discussion in Cornejo 01 about these points essentially rejecting the argument that you just made. Now, we're back to the victim-holding conundrum, but clearly our prior panel was well aware of those arguments when it — when Mr. Wilkie was — or his predecessor was last before us. You are right, Your Honor. The — and the one thing I can say, by the way, is the panel was well aware. Remember that these — none of these issues actually were briefed to that panel, which fits in maybe with Judge Kaczynski's view of a victim. He seems to think it's key whether it was addressed by the parties, and it was not. But you are correct, Your Honor. We believe that was victim, and it is incorrect because the panel did not pay, we believe, close enough attention to the fact that there was this rule of non-inquiry, and the prior panel somehow believed that the language that I read or something else in the FAR Act meant to overrule the rule of non-inquiry, and yet it cited nothing for that. The panel says, well, but there can be review under the Administrative Procedure Act. Remember, the Administrative Procedure Act has been around since 1948, and so — 46, I think, actually. I'm sorry. And so this Court has been applying, and its sister circuits has been applying the rule of non-inquiry in cases where there are claims of corruption, torture, all sorts of bad treatment to be expected in foreign countries. This Court has been applying the rule of non-inquiry. And I might add, one of the opinions that is mentioned, I don't think I can pronounce it, Arbathurna Star was a decision from this Court where somebody was being deported to Iceland, and she said she would be mistreated in prison there. And again, this Court said, that's not for us to determine. Mr. Wilkie said, well, but the determination made by the Secretary of State would be ministerial, a decision about whether to extradite. Remember that it — I think I used the term ministerial. Okay. I'm sorry. I'm sorry. You're absolutely right. I misspoke. Right. Mr. Wilkie said it would be discretionary. I apologize. It actually — Mr. Wilkie actually there was correct, Your Honor. It's highly discretionary because, obviously, in the vast number of cases, the Secretary will go forward with an extradition after there's a determination of extraditability. However, there will be the rare instances where the Secretary, for extremely sensitive foreign policy reasons, decides not to proceed with an extradition. But that is going to be the exception rather than the rule. The only other thing that I wanted to mention is, Your Honor, you — in one of your questions early on, you mentioned the Armstrong case. We believe, as our brief said, there is a parallel with the Armstrong case. And, in fact, this case is even stronger than Armstrong because there is, as you know, Chief Justice Rehnquist went through a discussion of the executive's discretion on prosecutorial discretion. Here we're dealing with something involving the most sensitive foreign relations, things that the Secretary of State has to do. This is — it's more — it's difficult to think of something that's more sensitive and would be — and less appropriate for judicial review. And so, as we — as we pointed out, as Mr. Whitten's declaration says, that's why it would be — we think it would be extremely troubling to put all of this out in the record for judicial review. If the Court has questions, I'm happy to answer them. Otherwise, I think I've covered — thank you very much, Your Honor. Thank you. The one thing that Respondent, I don't think, acknowledges here, but that the first panel did, is that while typically in the past the Secretary's decision to extradite has been discretionary, in this situation where you have a torture claim, the Secretary no longer has discretion. It's a mandatory duty by the Secretary not to extradite if the given circumstances are met.  So the discretion can only be exercised one way. No. The discretion — his discretion is not simply — if the finding is made, yes, there's a substantial likelihood that the person will be tortured. The Secretary then has no discretion to exercise. However, granted, the Secretary is the one who is going to make that factual threshold answer, that factual threshold question, and the review of that by a court will be under the highly deferential APA standard of review. Okay. Okay. The — just a couple points I'd like to address. This issue about seeking assurances and potentially judicial review causing embarrassment to a foreign country or interfering somehow because negotiations between the State Department and the foreign country will be brought out into the open, and these are backroom things that the public shouldn't know about. I don't doubt the — that they believe that argument. However, courts deal with that all the time. There are protective orders. There is in-camera review. There are ways in which interests of confidentiality can be preserved. And simply — Well, Mr. Wilkie, there are clearly areas, I'm thinking in the national security context, where we don't even get to peek behind the door. But at least we have — My question is whether this case falls more like spy cases than it does, you know, like building freeways. Before a court ever answers that question, they're at least told why they don't get to peek behind the door. And they're not just given some blanket, this is national defense, this is foreign affairs, therefore you don't get to peek behind the door. There's at least a threshold showing that is made by the side that's trying to keep the door closed, that courts shouldn't peek behind the door. That hasn't been made here because nobody's even cracked the door open. They are guarding it. They are keeping it shut and not letting anybody look. With regard to the rule of non-inquiry, again, Respondent only relies on half of the picture. The rule of non-inquiry has always had the caveat, always had the caveat, that there is an exception for situations that — excuse me, because I'd like to pull up the language. Situations where, upon extradition, the relator would be subject to procedures or punishments so antipathetic to a federal court's sense of decency as to require a reexamination.  I am quoting the language that is cited in the first Cornejo opinion from Galena v. Frazier, which is the Second Circuit case, which is largely the — Give us the site, too, so I can take a look at it. It's cited at Cornejo-Breda at 218 Fed 3rd at 100 — 1010. And the Galena case is 278 Fed 2nd, 7779 Second Circuit. And that is really the seminal case regarding the rule of non-inquiry. And every time that this Court has cited to or relied on the rule of non-inquiry, it has always been with that caveat. I would submit that when Congress passed the Foreign Affairs Reform and Restructuring Act, they were well aware of that caveat. Well aware of that caveat. And certainly, by anybody's definition, torture rises to that level. Respondent has said that the rule of non-inquiry has been applied in cases involving torture. I'm not aware of any such case, certainly no case from this circuit. The complaints in Lopez-Smith had to do with whether the government was corrupt down there. The complaints in the Iceland case, and I won't even try to pronounce the name, but had to do with the treatment that the person — the conditions in the prison, not claims that upon extradition, the person would be tortured by government officials. And that fundamentally distinguishes this case from all the others. Finally, the comment by Respondent Counsel that the Secretary will decline extradition only in cases where there are sensitive foreign policy concerns. It's discretionary, but the only time they ever do it is when there are sensitive foreign policy concerns. Really strikes — says to me that the Secretary himself doesn't understand its duty. And it's for this Court to tell the Secretary its duty. You cannot — you cannot extradite somebody where there's a substantial likelihood that they will be tortured. That's the law as stated by Congress. That's the treaty in this country under the U.N. Convention that's been — we've been a party to for 10 years now. And the Secretary still seems to take the position that it can do whatever it wants in extradition cases. And I would submit that's no longer the law. Thank you. All right. Thank you, Counsel, both of you, for your argument in this case. And the matter just argued will be submitted.
judges: Wallace, Rymer, Tallman